**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**U. S. CURRENCY et al.,
Defendants-Appellees.**

No. 78–1162.

United States Court of Appeals,
Sixth Circuit.

Argued April 7, 1980.

Decided July 14, 1980.

Hal D. Hardin, U. S. Atty., Nashville, Tenn., Louis M. Fischer, T. George Gilinsky, Jerome M. Feit, James R. Hastings, Washington, D. C., for plaintiff-appellant.

Hugh C. Howser (Gregory) Hugh C. Howser, Jr., Nashville, Tenn., for Gregory.

Joseph P. Binkley, Nashville, Tenn., for Banks.

Thomas D. Steele, Nashville, Tenn., for Garmon.

Before WEICK, CELEBREZZE and MERRITT, Circuit Judges.

WEICK, Circuit Judge.

The United States has appealed from the judgment of the District Court which

granted the motion of the Defendants-Appellees Gregory, Banks and Garmon to dismiss the government's proceeding brought under 18 U.S.C. § 1955 seeking forfeiture of certain currency and checks which were seized from them in a raid by the FBI, on the ground that it violated their Fifth Amendment privilege against self-incrimination.

The issue presented on appeal is, in essence, whether the forfeiture proceeding should have been summarily dismissed as ordered by the District Court without any trial, which would frustrate the government's interest in effectuating the Congressional intent to pursue forfeiture of the currency, or whether a conflict between the Fifth Amendment privilege and the forfeiture proceeding can be averted by fashioning some other alternative, short of dismissal, which can harmoniously accommodate both interests. We believe that both interests can be accommodated and that the judgment of the District Court should be vacated and the cause remanded.

## I

On December 16, 1975, pursuant to search warrants issued based upon information partially obtained in a prior judicially-approved wiretap, agents of the Federal Bureau of Investigation conducted a raid and seized certain currency, records, and other paraphernalia used in illegal gambling, from the appellees, including: $33,401 from Gregory, $45,706.75 from Banks, and $5,900 from Garmon. No indictments have been returned and filed as a result of the raid. On September 7, 1977, however, the United States filed the present forfeiture proceeding in the United States District Court for the Middle District of Tennessee, alleging that the items seized had been used in an illegal gambling business, in violation of 18 U.S.C. 1955. The Complaint alleged that the appellees and others had conducted a gambling business, in violation of Section 1955 and Tennessee law, from October 1, 1975, until December 16, 1975. Accompanying the complaint were interrogatories, consisting of 63 questions (and subparts), which

requested, inter alia, detailed information as to whether the appellees had participated in a gambling business, and as to the specifics of said participation.

The appellees then filed claims to the monies and property, and also tendered motions to dismiss on the ground that the forfeiture proceedings could not be maintained because of appellees' Fifth Amendment privilege against self-incrimination. On February 3, 1978, District Judge Morton granted the motion to dismiss. The District Court found that the interrogatories were patently designed to elicit incriminating information under 18 U.S.C. § 1955, as well as under the Tennessee statutes. The court stated that "this case is controlled by the holding of the Supreme Court in *United States v. United States Coin and Currency*, 401 U.S. 715 [91 S.Ct. 1041, 28 L.Ed.2d 434]", and concluded that "this case must be dismissed." The court ordered that the seized currency and property be returned to the claimants, "to the extent that such items are not per se contraband." Acknowledging, however, the possibility of "an ongoing criminal investigation arising out of the seizure of those items" in which the "items may be needed as evidence," the District Court ordered the government "to file a certificate of fact with the court stating whether any criminal investigations arising out of the seizure are ongoing before determining whether to order the return of the property." On February 22, 1978, the United States complied with the order by submitting a Certificate of Fact stating that:

> There are presently ongoing criminal investigations arising out of the seizure of property and currency from Woodrow John Gregory, James Albert Banks, and George Sidney Garmon on December 16, 1975, and this property and currency will be needed as evidence in such proceedings.

It is from the District Court's order of dismissal that the United States now appeals.

## II

The court is confronted with two interrelated questions: whether *Coin and Currency* does indeed control the case sub judice, and in fact mandates its dismissal; and whether the appellees' Fifth Amendment privilege against self-incrimination compels dismissal of the action. The court is inclined to answer both questions in the negative, and to remand the second question to the District Court for further consideration consistent with our opinion.

First, the court concludes that the Supreme Court's decision in *United States v. United States Coin and Currency*, 401 U.S. 715, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1971) neither controls this matter nor mandates the dismissal of the government's complaint. *Coin and Currency* was an action brought by the United States for the forfeiture of money in the possession of one Angelini when he was arrested for failure to register as a gambler and failure to pay the gambling tax required by Title 26, United States Code, Sections 4411, 4412, and 4901. The Supreme Court held that the Fifth Amendment privilege could properly be invoked because, "when the forfeiture statutes are viewed in their entirety, it is manifest that they are intended to impose a penalty only upon those who are significantly involved in a criminal enterprise." 401 U.S. at 721–722, 91 S.Ct. at 1045. This court finds quite persuasive the government's contention that there is "nothing to support the district judge's order dismissing the forfeiture proceeding by drawing an analogy to *Coin and Currency*." As the government has correctly explained, the *Coin and Currency* holding "flowed naturally" from the decisions in *Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968), and *Grosso v. United States*, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968), in which "the Supreme Court held that the federal wagering tax provisions, as then framed, unconstitutionally burdened the privilege against self-incrimination, since persons who failed to comply with the disclosure requirements of the statutory scheme were subject to ' "real and appreciable," and not merely "imaginary and unsubstantial" hazards of self-incrimination' stemming from the information disclosed." *Coin and Currency*, the government accurately notes, "involved a forfeiture proceeding under the very same statutory scheme involved in *Marchetti* and *Grosso*." Furthermore, the *Coin and Currency* Court expressed the same concerns voiced in the earlier cases, as demonstrated by the court's statement, in referring to *Marchetti* and *Grosso*, that "it was only the method Congress had adopted in collecting the tax that raised the Fifth Amendment question." 401 U.S. at 717, 91 S.Ct. at 1043. With reference to its earlier decisions, the court went on to explain that, "since it was only this method of tax collection which was subject to constitutional objection, we indicated that the Government remained free to collect taxes due under the statute so long as it did not attempt to punish the taxpayer for failure to file the required documents." Id. at 717–718, 91 S.Ct. at 1043.

The statutory scheme underlying the decisions in *Marchetti, Grosso,* and *Coin and Currency*, embodied the purpose of punishment for failure to file the required forms. In *Marchetti*, the court indicated that the privilege against self-incrimination may not be asserted "if other protection is granted which 'is so broad as to have the same extent in scope and effect' as the privilege itself." 390 U.S. at 58, 88 S.Ct. at 708. Subsequently, "Congress made several significant statutory changes." *United States v. Sahadi*, 555 F.2d 23, 25 (2nd Cir. 1977). As the Second Circuit stated, "The 1974 revisions of the federal wagering tax laws and the concomitant change in Treasury Department practices have eliminated the 'real and appreciable' hazards of self-incrimination that existed under the prior law." Id. at 27.

The case at bar, on the other hand, does not involve the type of self-reporting which created the constitutional obstacles in the aforementioned decisions. Section 1955 does not require that the gambler register or provide the government with any information whatsoever. Unlike the statute in-

volved in the *Marchetti-Coin and Currency* line, the structure of Section 1955, in and of itself, simply does not present a threat of self-incrimination.

Thus, while *Coin and Currency* obviously concerns certain of the issues presently before this court—specifically, self-incrimination in the forfeiture context—*Coin and Currency* does not control, nor mandate dismissal of, the case at bar without any trial as ordered by the District Court.

It is clear, however, that there are genuine threats to appellees' privilege against self-incrimination in the matter sub judice. Our focus must turn, then, to whether such threats justify dismissal of the forfeiture proceeding, or whether, as the appellant suggests, there may be "a solution which both protects the privilege and permits the forfeiture case to go forward."

The government states:

. . . appellees have the right to invoke the privilege against self-incrimination. It follows from this that no sanction may be imposed as a result of relying on the privilege. . . . We recognize that it would be a deprivation of fundamental rights to prevent appellees from attempting to prove their claims to the property merely because they may legitimately invoke their Fifth Amendment rights with respect to some of the questions in the interrogatories filed below. By this we mean that appellees should not have to choose between waiving their privilege against self-incrimination in order to satisfy their burden of proof, and remaining silent, thereby giving up the opportunity to prove their claims to the property at issue in this case. Brief p. 9.

Therefore, the government concedes that the appellees do have a privilege against self-incrimination in this situation, and seems to acknowledge, in its brief and at argument, that the court below was correct in ruling that appellees were not required to answer the interrogatories. The government vigorously maintains, however, that the District Court erred in dismissing the forfeiture action without any trial.

It is settled that "a witness in a . . . civil . . . proceeding may decline to answer questions when to do so would involve substantial risks of self-incrimination." *United States v. Parente*, 449 F.Supp. 905, 907 (D.Conn.1978); *Wehling v. Columbia Broadcasting System*, 608 F.2d 1084, 1086 (5th Cir. 1979). "Although the proceeding in which the privilege is asserted need not be criminal, the information for which the privilege is claimed must harbor the potential of exposing the speaker to a criminal or quasi-criminal charge." *In re Daley*, 549 F.2d 469, 478 (7th Cir.), *cert. den.*, 434 U.S. 829, 98 S.Ct. 110, 54 L.Ed.2d 89 (1977). Indeed, "it is only when there is but a fanciful possibility of prosecution that a claim of fifth amendment privilege is not well-taken." *In re Folding Carton Antitrust Litigation*, 609 F.2d 867, 871 (7th Cir. 1979). As the court in *United States v. Powe*, 591 F.2d 833, 845 n. 36 (D.C.Cir.1978) has explained, the "privilege operates where the information sought to be extracted presents 'a realistic threat of incrimination' . . . as distinguished from 'a mere imaginary possibility.'" See also *Wehling, supra* at 1087 n. 5. It is evident here that appellees face a very "realistic threat of incrimination."

The Supreme Court has declared that:

. . . government cannot penalize assertion of the constitutional privilege against self-incrimination by imposing sanctions to compel testimony which has not been immunized . . . the touchstone of the Fifth Amendment is compulsion, and direct economic sanctions and imprisonment are not the only penalties capable of forcing the self-incrimination which the Amendment forbids." *Lefkowitz v. Cunningham*, 431 U.S. 801, 806, 97 S.Ct. 2132, 2136, 53 L.Ed.2d 1 (1977).

See also *SEC v. Gilbert*, 79 F.R.D. 683 (S.D. N.Y. 1978). "The Supreme Court has disapproved of procedures which require a party to surrender one constitutional right in order to assert another." *Wehling, supra* at 1088. Further, "a prosecutor may not circumvent a person's privilege against self-incrimination by invoking a civil remedy to enforce a criminal statute." *Childs v.*

*McCord*, 420 F.Supp. 428, 433 (D. Maryland 1976), *aff'd* 556 F.2d 1178 (4th Cir. 1977). As the Seventh Circuit explained in *Ryan v. C. I. R.*, 568 F.2d 531, 542 (7th Cir. 1977), *cert. den.*, 439 U.S. 820, 99 S.Ct. 84, 58 L.Ed.2d 111 (1978), ". . . the forfeiture penalty is closely related to a criminal sanction, and the privilege against self-incrimination is operative." The forfeiture cases have served to "extend the Fifth Amendment privilege to proceedings which, although civil in form, involve the enforcement of a statute 'intended to impose a penalty only upon those who are significantly involved in a criminal enterprise.' " *Childs, supra* at 434.

Furthermore, as the Fifth Circuit has observed, "under the federal discovery rules, any party to a civil action is entitled to all information relevant to the subject matter of the action before the court *unless such information is privileged.* Fed.R.Civ.P. 26(b)(1). Even if the rules did not contain specific language exempting privileged information, . . . the Fifth Amendment would serve as a shield to any party who feared that complying with discovery would expose him to the risk of self-incrimination." *Wehling, supra* at 1086 (original emphasis); see also *Ryan, supra* at 538.

In the instant appeal, the Government has said:

> Due to the peculiar nature of a forfeiture action, in which the burden of proof shifts to a claimant after the government has shown probable cause for the complaint, we agree that appellees could not, in proper circumstances, be forced to surrender the privilege (against self-incrimination in) answering the complaint and offering evidence in support of their claims to the property. Brief p. 8

This court recognized the "peculiar nature" of such proceedings in *Colonial Finance Co. v. United States*, 210 F.2d 531, 533 (6th Cir. 1954), noting that, in forfeiture actions, ". . . when probable cause has first been shown for the institution of such suit or action, to be adjudged by the court, the burden of proof shall lie upon the claimant."

The court in *Tom v. Twomey*, 430 F.Supp. 160, 163 (N.D.Ill.1977), considered some of the procedural aspects of forfeiture under the statute involved herein:

> The forfeiture of any property used in violation of 18 USC 1955(a) is governed by the custom laws. 18 USC 1955(d). In the law of customs, if an action in rem is brought to forfeit a vehicle, the owner on being notified of the proceeding . . . is required to file a timely answer to the government's complaint, under oath. . . The answer should set out clearly and explicitly the facts relied on . . . And the failure to deny by answer is an admission.

Along the same vein, Judge Feikens, in view of the analogous situation presented in *Backos v. United States*, 82 F.R.D. 743, 745 (E.D.Mich.1979), expressed concern that:

> . . . by refusing to testify, plaintiffs will hurt their claim because they will be deprived of whatever benefit their own evidence might provide. Moreover, . . the government may be able to draw an adverse inference from plaintiff's refusal to testify.

The foregoing demonstrates that, especially in light of the posture of a forfeiture proceeding, in which the defendant actually has the burden of proof, the appellees here have the unenviable choice of incriminating themselves, or, of failing to file an answer, under oath, to the government's complaint and failing to vigorously pursue their claims to the currency.

■ Clearly, appellees should not be compelled to choose between the exercise of their Fifth Amendment privilege and the substantial sums of money which are the subject of this forfeiture proceeding. On the other side of the coin, however, the government should not be compelled to abandon the forfeiture action which Congress, by enacting the statute, obviously intended to create. Therefore, the courts must seek to accommodate both the constitutional right against self-incrimination as well as the legislative intent behind the forfeiture provision.

There may be occasions when the constitutional privilege totally precludes effectuation of the statutory forfeiture. In other words, it is possible that, under certain circumstances, forfeiture would be impossible without impermissibly impinging upon the Fifth Amendment privilege, and, although it does not appear so to this court, this may be one such situation. It is unnecessary, however, for this court to determine, at this point at least, whether this is a situation where serious collision between the two interests cannot possibly be avoided, or to determine what device can prevent the collision. Indeed, it is unnecessary for the court to set down a hard and fast rule for each case when, typically, the District Court is in a better position to know what means will accomplish the end of accommodating both interests. Like the court in *Thomas v. United States*, 531 F.2d 746, 750 (5th Cir. 1976), "we see no need for the exercise of our supervisory power to adopt a specific procedure." Therefore, this matter should be remanded to the District Court for exploration into the alternatives available for said accommodation, that is, for achieving what the government has described as "a solution which both protects the privilege and permits the forfeiture case to go forward."

While "the district court was understandably and properly concerned that the (appellees) not be forced to choose between forfeiting their property without contesting the (government's action) on the one hand and, on the other, incriminating themselves by admitting . . . that they had been engaged in an illicit enterprise . . .", *Iannelli v. Long*, 487 F.2d 317, 318 (3rd Cir.) cert. den., 414 U.S. 1040, 94 S.Ct. 541, 38 L.Ed.2d 330 (1973), the "dismissal of the lawsuit was premature at this stage of the proceeding." *Wehling, supra* at 1089. See also *Jones v. B. C. Christopher and Co.*, 466 F.Supp. 213, 227 (D. Kansas 1979) (". . . such harsh sanctions cannot be invoked in the present posture of the case.") Indeed, "because dismissal is a severe sanction, its use must be tempered," *Backos v. U. S.*, 82 F.R.D. 743, 744 (E.D.Mich.1979). See also *Wehling, supra* at 1087 n. 6. However,

". . . dismissal is a potentially appropriate sanction," *Jones, supra* at 227, and "the district court is not precluded from dismissing . . . if circumstances arise which require the use of this drastic remedy." *Wehling, supra* at 1089. It must be emphasized that the trial court should guard against allowing the appellees to use the "Fifth Amendment shield as a sword," *Wehling, supra* at 1087; see also *Backos, supra* at 745, to defeat the government's forfeiture action when alternatives may be available. Just as the court interceded in *Thomas v. United States, supra* at 749, when "the government . . . devised a way to procure automatic dismissal of the taxpayer's suit for wagering tax refund . . . by the simple device of filing interrogatories framed to oblige the taxpayer to incriminate himself or forego his lawsuit," so the District Court should be reluctant to allow appellees to seize the offensive and turn the tables, thereby frustrating the congressional intent behind the forfeiture provisions, if there is any means of fully protecting appellees' constitutional rights, short of outright dismissal.

There are several alternatives, short of outright dismissal, which might be appropriate here. The court is of the opinion that the court below, in its discretion, may examine the possible approaches and, perhaps with the cooperation of the parties, select that means which "strikes a fair balance . . . and . . . accommodates both parties," *Shaffer v. United States*, 528 F.2d 920, 922 (4th Cir. 1975).

The appellees cannot be compelled to testify and could prove their claims by other witnesses. If they can rebut the government's probable cause case they can compel the government to prove its cases.

One other possible alternative, which the United States has advanced on appeal, is the grant of immunity to appellees. See *Jones, supra* at 225. This option is one requiring the cooperation, if not the initiative, of the government for the federal courts have no inherent power to grant immunity, and "18 USC 6003 commits the decision to grant or deny immunity to the

sole discretion of the exclusive branch of the Government." *United States v. Lenz*, 616 F.2d 960, 962 (6th Cir. 1980); *United States v. Klauber*, 611 F.2d 512, 517 (4th Cir. 1979) ("At most, (the district judge) could impose sanctions for a failure by the government to respond affirmatively to a request that the witness be immunized."); *United States v. Bacheler*, 611 F.2d 443, 449–50 (3rd Cir. 1979); *Appeal of Starkey*, 600 F.2d 1043, 1047 (8th Cir. 1979); *Ryan, supra* at 540; *In re Daley, supra* at 479; and *Shaffer, supra* at 922. In considering the feasibility of the immunity approach, the District Court should be particularly mindful of the potential for prosecution under state law. See e. g. *Backos, supra* at 745. Furthermore, should immunity prove, upon consideration, to be the only viable approach in this situation, and should the government then decide against granting immunity, the District Court may choose to impose sanctions, including dismissal, upon the government.

In addition to the immunity approach, several other alternatives may be available. The District Court should not feel constrained to limit its consideration to those courses discussed here, but should choose the means which it perceives to be best suited for the instant situation. For example, the court could request, or the government could initiate, certifications from both federal and state prosecutors guaranteeing that neither will prosecute the appellees for any offenses in any way related to the incidents underlying the forfeiture action.

The court might also choose to stay the forfeiture proceedings until the completion of any criminal prosecutions, or until the relevant statutes of limitations for the federal and state criminal offenses have expired. (Indeed, in the several years that have elapsed since the incidents underlying the forfeiture action, the statutes of limitations may have already run on some or all of the offenses for which appellees could conceivably be prosecuted, and this is an issue deserving of the trial court's close attention.)

Several courts, when faced with the need to make the accommodation required here, have determined that stay orders in the civil action were the appropriate solution. Indeed, the Supreme Court in *United States v. Kordel*, 397 U.S. 1, 9, 90 S.Ct. 763, 768, 25 L.Ed.2d 1 (1970), in dicta, suggested that, in some situations, "the appropriate remedy would be a protective order under Rule 30(b) postponing civil discovery until termination of the criminal action." The *Kordel* decision embodies "a recognition of the power of the federal courts, after a balancing of interests in the particular case before them, to stay civil suits because of pending criminal charges." *Arthurs v. Stern*, 560 F.2d 477, 479 (1st Cir. 1977) *cert. den.* 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978). The Fourth Circuit, in *Shaffer, supra* at 922, directed the District Court to "stay further proceedings until the Government has obtained immunity for the taxpayer or until all applicable statutes of limitations have run." Likewise, the Third Circuit has indicated that ". . . further proceedings in (the civil action) would properly be deferred on the plaintiff's request until the conclusion of related criminal proceedings against them or until the running of all applicable periods of limitations on prosecutions." *Iannelli, supra* at 318. In *Wehling, supra* at 1089, the Fifth Circuit, reversing and remanding for entry of a protective order temporarily staying further discovery, acknowledged that a three-year hiatus in the civil lawsuit (because of the relevant criminal statutes of limitations) would be an undesirable inconvenience, but was preferable "to requiring plaintiff to choose between his silence and his lawsuit." See also *Jones, supra* at 227. The case at bar is not a situation where initiation of, or going forward with, a civil suit should not be delayed pending "the conclusion of a criminal action", because "the public welfare is at stake." *SEC v. Gilbert, supra* at 686; see also *Kordel, supra* at 11, 90 S.Ct. at 769. Here there is no strong public interest in proceeding expeditiously in the forfeiture action. While Section 1955(d) and 19 U.S.C. § 1602 *et seq.* "require that a forfeiture proceeding be

promptly instituted . . . (and) due process requires that forfeiture proceedings against seized property be brought without unreasonable delay," *United States v. $40,-454 in U. S. Currency*, 469 F.Supp. 1041, 1943 n. 2 (W.D.Pa.1979); see also *United States v. Premises Known as 608 Taylor Ave.*, 584 F.2d 1297, 1304 (3rd Cir. 1978), the forfeiture proceeding here has, obviously, already been instituted, and there seems to be little reason why a stay in that proceeding would not be proper under the circumstances.[1]

The District Court's order of dismissal is hereby vacated, and the cause is remanded to that court for further proceedings not inconsistent with our opinion, to determine whether, as the government's asserts, ". . . remedies are available which will preserve appellees' Fifth Amendment rights while also enabling them to answer the complaint and present evidence."

MERRITT, Circuit Judge, concurring.

The fundamental problem with the Court's opinion is that it does not address the question of whether a forfeiture proceeding is a criminal proceeding in which the defendant is entitled to the normal constitutional protections applied in criminal cases. Without addressing the issue, the Court treats the proceeding as a kind of hybrid which is neither fish nor fowl.

I agree that *United States v. U. S. Coin & Currency*, 401 U.S. 715, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1971), does not require dismissal of the forfeiture proceedings. I believe, however, that procedures in addition to those the Court has suggested are necessary to protect Fifth Amendment and other rights.

The burden must be placed on the Government to prove its case beyond a reasonable doubt as in any other criminal case. A gambling forfeiture action is a criminal proceeding governed by constitutional protections applicable in other criminal cases. Justice Harlan wrote for the majority in *U.S. Coin & Currency* that gambling forfeiture proceedings are criminal in nature:

. . . [A]s *Boyd v. United States,* 116 U.S. 616, 634, 6 S.Ct. 524, 534, 29 L.Ed. 746 (1886), makes clear, "proceedings instituted for the purpose of declaring the forfeiture of a man's property *by reason of offences committed by him,* though they may be civil in form, are in their nature criminal" for Fifth Amendment purposes. (Emphasis supplied.) From the relevant constitutional standpoint there is no difference between a man who "forfeits" $8,674 because he has used the money in illegal gambling activities and a man who pays a "criminal fine" of $8,674 as a result of the same course of conduct. In both instances, money liability is predicated upon a finding of the owner's wrongful conduct; in both cases, the Fifth Amendment applies with equal force. See also *One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 700, 85 S.Ct. 1246, 1250, 14 L.Ed.2d 170 (1965).

. . . When the forfeiture statutes are viewed in their entirety, it is manifest that they are intended to impose a penalty only upon those who are significantly involved in a criminal enterprise. 401 U.S. at 718, 721–22, 91 S.Ct. at 1043, 1045 (footnote omitted).

Just as in the case quoted above, the forfeiture of cash here is a penalty predicated upon a finding of the owner's wrongful conduct. The statutory authority for forfeiture proceedings, 18 U.S.C. § 1955(d), appears within the criminal code. We must therefore instruct the District Court that it must afford claimant the same safeguards he would be afforded in any other criminal trial. This includes the presumption of innocence, proof beyond a reasonable doubt,

---

1. In balancing the appellees' Fifth Amendment privilege against the desire not to frustrate the congressional intent behind the forfeiture statute, one factor which the court should weigh, particularly in considering the use of a temporary stay, is the possible hardship which appellees may suffer if there is a length delay in the adjudication of the forfeiture proceeding, especially in light of the substantial sums of money involved herein. See e. g. *White v. Cardoza,* 368 F.Supp. 1397, 1400 (E.D.Mich.1973). For example, the court might consider placing the funds in an interest-bearing account during the pendency of the civil action.

and the right to remain silent without automatically suffering forfeiture.

The Court suggests that self-incrimination problems may be avoided if the claimant can produce other witnesses or evidence that would carry the burden without his personal testimony. I do not think that solution will work. If the government is not required to prove its case as in any other criminal case, the fact-finder will still be able to draw adverse inferences from a claimant's failure to testify. This violates both the privilege against self-incrimination and the presumption of innocence.